IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ASTRID TENDIS-KNELY, as the Personal Representative of the heirs of NORMAN TENDIS, deceased, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. |
| THE BOEING COMPANY, a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

### COMPLAINT

Plaintiff **ASTRID TENDIS-KNELY**, as Personal Representative of the heirs of **NORMAN TENDIS**, deceased, brings this action for damages on behalf of **NORMAN TENDIS**, his estate, heirs, and survivors against Defendant **THE BOEING COMPANY ("BOEING")** as follows:

## I.     INTRODUCTION

1.     This action arises from the horrific crash of **ETHIOPIAN AIRLINES** Flight 302 ("Flight 302") on March 10, 2019 in which 157 people lost their lives. The aircraft involved in  Flight 302 was a Boeing 737 MAX 8. This crash came less than five months after Lion Air Flight  JT 610 – another Boeing 737 MAX 8 – crashed into the Java Sea on October 29, 2018, killing all  189 onboard.

2.     Investigation into both crashes is ongoing, but the similarities in the aircraft and the investigative findings for the crashes thus far points to a common cause. Shortly after taking off  and while attempting to climb, pilots for both aircraft reported flight control issues as the

planes  pitched up and down erratically throughout the sky. The flight paths and data released thus far for  both aircraft show that the pilots  were engaged in a terrifying tug-of-war with the  plane's  automated systems as the pilots  manually tried to climb while the computer system repeatedly  caused the plane to dive with increasing nose-down trim against the pilot inputs. Pilots of both  Flight 302 and Flight 610 lost their fight with **BOEING's** flight computer, and  hundreds of  passengers and crew lost their lives due to **BOEING's** flight computer driving the airplanes into  the ground.

3.  BOEING CEO Dennis Muilenburg has said, "it's apparent" that the 737 MAX 8's Maneuvering Characteristics Augmentation System (MCAS) contributed to two fatal air accidents. Investigators had long suspected the system's role in the disasters.

4.  Muilenberg's statement comes on the same day Ethiopian investigators determined that Flight 302's crew, *"had performed all the procedures repeatedly, provided by [Boeing], but was not able to control the aircraft."* Media network CNN, claiming to have seen the full report, described how the pilots fought the plane's MCAS system for the entirety of the six-minute flight, but were unable to pull the plane's nose up and regain control.

5.  The 737 MAX 8 is grounded worldwide following the Ethiopian Airlines disaster, and Boeing is currently previewing a software update that Muilenberg said will *"eliminate the possibility"* of a similar accident happening again. The update will need to be approved by air regulators worldwide before the 737 MAX will take to the sky again.

6.  A group of Boeing engineers told the Seattle Times last month that pilots were unaware of how to override the MCAS system, and Boeing has promised to rectify this too by providing *"additional educational material."* In addition, two critical safety features that could have warned pilots of an impending dive were sold as optional extras by the manufacturer. One

of these – a warning light – will now be fitted as standard.

7.     **BOEING** installed the defective flight control system suspected to be the cause of both crashes to address changes in the aircraft's handling caused by the 737 MAX aircraft's larger and more fuel-efficient engines. Both the design changes boosting fuel efficiency and the unsafe way in which **BOEING** designed and certified the flight control system were tools to make the 737 MAX aircraft more competitive against rivals like the Airbus A320, which would in turn increase **BOEING's** sales and profits.

8.     **BOEING** actively concealed the nature of the automated system defects. Numerous decisions by **BOEING's** leadership substantially contributed to the subject crash and demonstrate **BOEING's** conscious disregard for the lives of others, including but not limited to **BOEING's** role in: designing an aircraft with a powerful automated flight control system susceptible to catastrophic failure in the event of a single defective sensor; failing to properly inform pilots of the existence of the new flight control system and educate and train them in all aspects of its operation; failing to properly address the new system in the aircraft's flight manual; refusing to include key safety features as standard in the aircraft rather than optional upgrades; delivering 737 MAX aircraft with a version of the flight control system that was materially different from the version presented to the FAA during certification; and failing to take appropriate action after **BOEING** learned that the 737 MAX aircraft was not performing as intended or safely, as was made tragically clear with the crash of Lion Air Flight JT 610.

9.     **BOEING's** reckless decision to put profits over safety is further evident in **BOEING's** repeated claims that the 737 MAX 8 is so similar to its earlier models that it does not require significant retraining for those pilots familiar with the older generation of 737s. **BOEING** has insisted that retraining is not required, even after Lion Air Flight 610

crashed, because airlines would buy fewer **BOEING** aircraft if pilots needed to be retrained. In so doing, **BOEING** risked people's lives merely to improve its bottom line and must pay punitive damages to punish and deter **BOEING**, and others, from doing so again.

## II.   JURISDICTION AND VENUE

10.   The Court has subject matter jurisdiction of this dispute pursuant to 28 U.S.C. § 1332, as this case involves a dispute between Plaintiff, a citizen of Poland, and Defendant which is a corporation based in the State of Illinois, and the amount in controversy exceeds the jurisdictional minimum of this Court.

11.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant **BOEING** is a resident of this District and a substantial part of the events or omissions giving rise to the claim occurred in this District. Key decisions were made by **BOEING's** corporate leadership in Chicago, including those decisions regarding the development of the 737 MAX, certification of the aircraft, and disclosures to airlines.

## III.   THE PARTIES

### A.   PLAINTIFF

12.   Decedent NORMAN TENDIS **("DECEDENT")** was a passenger on board Ethiopian 302 when it crashed on March 10, 2019. Plaintiff ASTRID TENDIS-KNELY is the next of kin for **DECEDENT** and is the Personal Representative of the heirs of NORMAN TENDIS and brings this action on his behalf and on behalf of his estate, heirs, survivors, and beneficiaries **("PLAINTIFF"). DECEDENT** NORMAN TENDIS was a citizen of Germany and **PLAINTIFF** ASTRID TENDIS-KNELY is a citizen of Austria.

### B.   DEFENDANT

13.   At all times herein mentioned Defendant **THE BOEING COMPANY** is a

Delaware corporation with its principal place of business in the State of Illinois. Boeing is, and at all relevant times was, registered with the Illinois Secretary of State as doing business in Illinois, and it does business in Illinois and in this Judicial District. **BOEING's** headquarters are located in this District where the relevant decisions and omissions giving rise to this incident were made, authorized ratified and/or approved.

## IV.  STATEMENT OF FACTS

### A.  BOEING'S CEO ADMITS FAULT

14.  BOEING CEO Dennis Muilenburg has said, "it's apparent" that the 737 MAX 8's MCAS maneuvering system contributed to two fatal air accidents. Investigators had long suspected the system's role in disasters.

15.  In addition, James F. Albaugh of **BOEING's** commercial airplanes division, told employees at a meeting in January 2011 that Airbus' decision to redesign its existing aircraft with larger engines would be "a design change that will ripple through the airplane" and present significant challenges.[1]

16.  **BOEING's** tune changed when it learned that some of its key customers, including American Airlines, would be placing orders with Airbus for their fuel-efficient aircraft. This ratcheted up pressure on **BOEING** to respond. Since the design of an entirely new jet would take too long, **BOEING** decided to create a more fuel-efficient alternative to its traditional 737NG aircraft – what would become the 737 MAX.

17.  A former senior **BOEING** official reported that the company opted to build the 737 MAX, rather than an entirely new aircraft, because it would be "far quicker, easier and

---

[1] David Gelles, Natalie Kitroeff, Jack Nicas, and Rebecca R. Ruiz, "Boeing 737 Max: A jet born of a frantic race to outdo a rival," New York Times, March 24, 2019.

cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."[2]

18.     Rick Ludtke, an employee at **BOEING** for 19 years and an engineer who helped design the 737 MAX cockpit explained that "[a]ny designs we created could not drive any new training that required a simulator." That was the first ground rule communicated to engineers designing the MAX. This created a chaotic environment for engineers. As Ludtke described: "The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."[3]

19.     The need to minimize design changes served an important business need for **BOEING**. If airline pilots did not require costly and time-consuming training in the new aircraft because it was viewed as merely an update to the familiar 737NG, it would make the 737 MAX cheaper for airlines to operate. This in turn would make the price for the 737 MAX more competitive relative to the Airbus A320neo and far more profitable for **BOEING**.

20.     Thus, **BOEING** needed the 737 MAX aircraft to be more fuel efficient and also handle similarly to the 737NG. The MAX aircraft was able to achieve this new fuel efficiency, in part, due to the model's larger engines, the CFM LEAP-1B Engine. However, adding the larger engines triggered cascading design and engineering changes for the aircraft, the same ripple of changes James Albaugh, **BOEING's** commercial airplanes chief executive, had predicted back in 2011 when criticizing Airbus' A320neo.

21.     The larger engines could not be mounted in the same location as the engines on the 737NG so they had to be moved further forward on the plane, which in turn required moving

---

[2] *Id.*
[3] *Id.*

the forward landing gear. The more powerful engines, coupled with their new location, caused the 737 MAX to handle differently from the 737NG by changing the plane's lift characteristics. A 737NG pilot operating the 737 MAX would find that the 737 MAX would ascend faster and at a higher angle, increasing the risk of a stall.

22.     As **BOEING's** business leaders required engineers to contain the level of change to avoid pilot retraining and make the 737 MAX more marketable, **BOEING** now needed to engineer a band-aid to fix the aircraft's handling issues created by the larger and more powerful engines.

### B.     BOEING KNEW MCAS WAS DEFECTIVE AND DANGEROUSLY FLAWED

23.     **BOEING** included a new automated flight-control system in the MAX aircraft, the Maneuvering Characteristics Augmentation System (MCAS) to address the risk of a stall.

24.     However, as **BOEING's** CEO has acknowledged MCAS contributed to both the Lion Air and Ethiopian Air crashed.

25.     The MCAS collected data from a single sensor on the fuselage called the angle-of- attack sensor ("AOA sensor") which measures the angle between the wing of the plane on the oncoming airflow at the front of the plane. If the AOA sensor registers that the angle is too high – that the plane is climbing too sharply – then the MCAS activates, automatically swiveling the horizontal tail of the plane to move the plane's nose down, as can be seen in the following graphic:



26.    The MCAS was not programmed to use data from both of the airplane's AOA sensors to help validate the AOA data and protect against single point failures. This meant that if  the single AOA sensor used as input to the MCAS malfunctioned and erroneously believed the  plane was climbing too quickly, then there was no means of detecting its erroneous condition and  excluding that data prevent the MCAS from improperly intervening and forcing the plane to dive.

27.    The MCAS was intended to automatically adjust the pitch of the plane to avoid stalling with the MAX's more powerful engines when the plane was being controlled manually by  the pilot. The pilot would not need to manually activate the MCAS, nor would the aircraft inform  the pilot that the MCAS system was making pitch trim inputs.

28.    Unbelievably, since the MCAS was intended to operate in the background without pilot  knowledge, **BOEING** did not even inform pilots that the MCAS existed. The MCAS was not  disclosed in the aircraft's flight manual either. Pilots would only learn indirectly about the MCAS  when the plane began automatically fighting their pitch commands, often at

low altitudes with little time to react and resolve the issue.

29. A **BOEING** executive met with pilots' union representatives in November 2018, after the Lion Air crash. According to pilot Dennis Tajer who was in attendance, **BOEING** executives tried to excuse their failure to disclose this system by explaining that they did not wish to "inundate" pilots with too much information about the new plane.[4] Frustrated, pilot unions have described **BOEING's** actions in failing to disclose the software as a "breach of trust."[5]

### C. BOEING IGNORED SAFETY IN PURSUIT OF PROFITS

30. The New York Times interviewed several of the engineers and designers working on the MAX who described the tremendous pressure placed on them to quickly get the MAX's developed:

    a. An engineer working on the MAX said that "[t]he timeline was extremely compressed … It was go, go, go."[6]

    b. A former designer working on the MAX's flight controls described how the design team had at times produced 16 technical drawings a week, double the normal rate. The designer understood the message from management to be: "We need something now."[7]

    c. A technician who assembles wiring on the MAX said that he received sloppy blueprints in the first few months of development and was told that the instructions for the wiring would be cleaned up later in the process. However, his internal assembly designs for the MAX apparently still include omissions

---

[4] https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia- lion-air.html
[5] *Id.*
[6] New York Times, *Boeing 737 Max: A jet born of a frantic race to outdo a rival*; by David Gelles, Natalie Kitroeff, Jack Nicas, Rebecca R. Ruiz, March 24, 2019.
[7] *Id.*

today, such as not specifying which tools to use to install a certain wire, a situation that could lead to a faulty connection. This is quite different from standard procedures because normally such blueprints include intricate instructions.[8]

31.     On information and belief, the unreasonable expectations placed on engineers and designers by the corporate business leadership centered in Chicago created an environment at **BOEING** facilities which was ripe for mistakes and wherein employees were reluctant to raise concerns that may delay certification and production of the MAX.

32.     A lawsuit filed in state court in South Carolina on March 16, 2019 by a former **BOEING** Quality Assurance Conformity Manager, calls into question the integrity of **BOEING's** testing and inspections procedures. This manager was tasked with inspecting all newly manufactured aircraft for compliance with internal engineering and safety specifications. Each incidence of non-conformity that **BOEING** inspectors encounter is supposed to be documented by **BOEING** as well as all repairs and subsequent inspections.

33.     According to the manager's complaint, at one of **BOEING's** manufacturing plants, **BOEING** agents and/or employees engaged in improper conduct including:

a.      "Goldplating" which is repeating a test until it is successful and then having the records show that the test was successful on the first attempt;

b.      Knowingly using out of date engineering specifications;

c.      Knowingly using uncertified technicians to perform maintenance and repairs;

d.      Violating the internal Boeing policy and procedures that were put in place to achieve final approval of each stage of production and make the plane

---

[8] *Id.*

immediately saleable;

e.   Disabling the automated system that notified all pertinent employees of mandatory inspections of newly manufactured aircraft; and

f.   Submitting conformities without documented repairs

34.   The manager also alleges that when he tried to document non-conforming aircraft equipment, he was threatened, retaliated against, subjected to a hostile work environment, and eventually terminated.

35.   On information and belief, this manager's allegations relating to violations of safety standards, falsified inspection records, and an environment of distrust and retaliation, are representative of wrongful conduct and violation of safety protocols at other **BOEING** manufacturing facilities. Plaintiffs further allege that these issues were known, encouraged and/or ratified by **BOEING's** leadership and contributed to a culture that suppressed voices raising the alarm about safety in furtherance of **BOEING's** profit-driven focus.

**D.**   **BOEING CONDUCTED A FLAWED SAFETY ASSESSMENT OF THE MCAS AND FALSIFIED DATA TO THE FAA**

36.   In addition to the questions about **BOEING's** design and manufacturing procedures at the time of the MAX was undergoing design and certification, the protocols for **BOEING's** safety assessment of the MCAS showed glaring errors.

37.   The MCAS was designed to swivel the horizontal tail to push the nose of the plane down to avert a stall. **BOEING** tested this system, but the safety analysis understated the power of the system.

38.   **BOEING** submitted documentation to the FAA indicating that the MCAS could only move the horizontal tail a maximum of 0.6 degrees. However, when the MAX 8 was put into service, the MCAS was capable of moving the tail 2.5 degrees, more than four times than

the 0.6 degrees stated in the initial safety analysis provided to the FAA. The version of the MCAS that **BOEING** embedded in its aircraft and sold all over the world was materially different and far more powerful than what **BOEING** represented to the FAA and other regulatory agencies. The FAA did not learn that the MCAS would move the horizontal tail 2.5 degrees until after 189 people were killed in the Lion Air crash.

39. The safety analysis also failed to account for how the MCAS could reset itself after each time a pilot responded. This meant that a malfunctioning MCAS would not just cause a single downward movement of 2.5 degrees, but could dip the nose of the aircraft 2.5 degrees lower multiple times as the pilot tries to regain control. Without correction, two cycles of the MCAS at the 2.5 degree limit could cause the aircraft to reach its maximum nose-down trim position. Peter Lemme, a former Boeing flight controls engineer, explained to the Seattle Times that, since the MCAS can reset each time it is used, "it effectively has unlimited authority." [9]

40. Based on **BOEING's** own flawed assumptions – that the MCAS' maximum authority was 0.6 degrees – **BOEING's** System Safety Analysis classified the MCAS as a "major failure" in normal flight and a "hazardous failure" in the event of an extreme maneuver, such as a banked descending spiral. [10] A "major failure" indicates that the system's failure could cause physical distress to people on the plane, but not death. A "hazardous failure" could cause serious or fatal injuries to a small number of passengers. One level above hazardous failure is "catastrophic failure," which represents the loss off the plane with multiple fatalities.

41. The failure classification system is important because it drives whether a flight

---

[9] https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/
[10] *Id.*

control system can rely on a single sensor input or must have two or three. Systems with a consequence of failure classified as a "major failure" must have a probability of failure less than one in 100,000. Typically, such systems are allowed to rely on a single input sensor.[11]

42. In contrast, systems classified as "hazardous failure" have more severe consequences of failure and therefore must have a probability of failure less than one in 10 million. Systems classified as "hazardous failure" typically must have at least two separate input channels as a backup in the event one sensor fails.[12] With the MCAS being classified as a "hazardous failure," it should have had a redundant back-up system. Instead the MCAS could be triggered by a reading from a single AOA sensor and, once triggered, it had unlimited authority to pitch the nose of the aircraft down.

43. **BOEING** had a second AOA sensor on the airplane that it could have used to provide redundancy and safety, and which it is now using in its MCAS software "fix" after these two fatal accidents, but it chose not to do so during design and certification to save whatever time and money it could. **BOEING** did the same thing in its design of the 737 auto-throttle system prior to the 2009 Turkish Airlines Flight 1591 crash in Amsterdam – reliance on a single sensor input instead of two readily available inputs – and after that accident quickly issued a software fix to prevent recurrence. **BOEING** should have learned from that accident to never try to save money via single sensor reliance on critical systems, but once again did so on the 737 MAX MCAS design, costing NORMAN TENDIS and others their lives.

44. As **BOEING's** former flight controls engineer, Peter Lemme, told the Seattle Times: "A hazardous failure mode depending on a single sensor, I don't think passes muster."[13]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*

45.     **BOEING** has repeatedly and intentionally violated this system safety design principle and egregiously abused its FAA certification designee position to allow it to pass certification muster, resulting in hundreds of **BOEING** airplane passenger deaths and injuries over the years.

### E.     BOEING REJECTED MULTIPLE OPTIONS TO MAKE ITS PLANE SAFER

46.     Despite the MCAS' glaring flaws, **BOEING** had two available safety features that could mitigate the risk of the AOA sensor failing and causing an uncontrolled dive, but consciously chose to make these safety features optional add-ons for airlines and charge extra. One such feature is an angle of attack indicator, which would display the readings from the AOA sensor.[14] Without this upgrade, pilots do not have a reading of what the AOA is registering, making it more difficult to identify an AOA malfunction.

47.     The other safety feature is called a disagree light. The MAX 8 comes outfitted with two AOA sensors at the front of the plane, but the MCAS only takes readings from one sensor on any given flight, leaving the system vulnerable to a single point of failure. Upgrades to the MCAS software coupled with the installation of a disagree light in the cockpit would alert pilots if the two AOA sensors register readings at odds with the other.

48.     Aviation analyst, Bjorn Fehrm, told the New York Times that these safety features are "critical" and "cost almost nothing for the airlines to install."[15] Upgrades to the MCAS software could also program the system to turn off in the event the two AOA readings are materially out- of-sync.[16]

---

[14] https://www.nytimes.com/2019/03/21/business/boeing-safety-features-charge.html
[15] *Id.*
[16] https://www.nytimes.com/2019/03/21/business/boeing-safety-features-charge.html

49.    Despite the potential for the AOA sensor failing and wrongfully activating the MCAS to force the plane downward, **BOEING** did not install the AOA indicator or disagree light as standard. Instead, **BOEING** charges a premium for these essential safety features.[17]

F.    **BOEING MISREPRESENTED ITS AIRCRAFT TO PILOTS AND AIRLINES, DOWNPLAYING THE NEED FOR ESSENTIAL TRAINING**

50.    With the MAX 8 certified by the FAA, **BOEING** began delivering aircraft all over the world starting in May 2017. The MAX 8 was an incredibly popular aircraft and incredibly profitable for **BOEING**.[18]

51.    As **BOEING** had intended, pilots transitioning from the older 737s to the 737 MAX 8 were not required by the FAA to receive extensive training on the 737 MAX aircraft because it obtained the same "type rating" as early 737 models. This was a primary selling point for the MAX as it was presented to airlines. On its website, **BOEING** represented to airlines that "as you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737."[19]

52.    Due to **BOEING's** representations regarding the MAX's commonality with the 737NG, pilots have reported that they were given just 56 minutes of training on an iPad about the differences between the new **BOEING** MAX planes and the older 737s. The MCAS system was not discussed during this training.

53.    With simulators for the new aircraft unavailable at the time the 737 MAX was pressed into service, pilots with United Airlines put together their own 13-page guide to the 737 MAX, but even this guide failed to mention the MCAS, leaving pilots unprepared to

---

[17] *Id.*

[18] https://www.newyorker.com/news/our-columnists/how-did-the-faa-allow-the-boeing- 737-max-to-fly

[19] https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa- missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

deal with a sudden and unexpected dive by the automated systems in the aircraft that they did not know existed.[20]

54.     American Airlines pilot union representative and 737 pilot, Dennis Tajer, explained: "When you find out that there are systems on it that are wildly different that affect the performance of the aircraft, having a simulator is part of a safety culture…It can be the difference between a safe, recoverable flight and one that makes the newspapers."[21]

### G.      LION AIR FLIGHT JT 610 CRASHES AFTER PILOTS EXPERIENCE A FLIGHT CONTROL ISSUE

55.     On October 29, 2018, Lion Air flight JT 610 ("Flight 610") departed Jakarta, Indonesia. Shortly after takeoff, the pilots complained of flight control issues as the plane repeatedly pitched down despite the pilots' efforts to climb. The pilots reported unreliable airspeed and altitude readings. In the audio recordings from the cockpit, the rattle of a stick shaker can be heard, a device used to alert pilots of a potential stall, which can occur when a plane ascends too quickly.

56.     The pilots requested permission to return to Jakarta, which was granted, but the plane did not return. Satellite data showed the plane rising and falling repeatedly – more than 20 times – as the pilots struggled to wrest control back from the automated systems. Within just 12 minutes of taking off, Flight 610 crashed into the Java Sea, killing all 189 people onboard.

57.     The cockpit voice recording recovered from the wreckage revealed that while the plane danced perilously across the sky, one of the pilots flipped through a technical manual

---

[20] https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia-lion-air.html
[21] https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia-lion-air.html

in an attempt to identify the problem while the other pilot prayed.[22] The pilots appeared unaware of the MCAS and its potential role in overriding their manual controls.[23]

58.     Preliminary analysis of the crash and data obtained from the plane's flight data recorder (FDR) show that one of the AOA sensors produced a reading that was at least 20 degrees different from the other AOA sensor as the plane took off and began its climb. This strongly suggests that a malfunction in the AOA sensor feeding information to the MCAS triggered an unwarranted activation of the MCAS system at low altitudes, causing the plane's nose to pitch down.

## H.    **BOEING FAILED TO TAKE NECESSARY ACTION**

59.     Following the tragic crash of Lion Air Flight 610, **BOEING** knew or had reason to suspect that a malfunction in the AOA sensor and MCAS may have been responsible. **BOEING** issued an Emergency Airworthiness Directive ("AD") on November 6, 2018 identifying the potential danger presented by the flight control system, but not providing clear instruction on what pilots should do in the event of an AOA failure:

> "This AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for **repeated nose-down trim commands of the horizontal stabilizer.** We are issuing this AD to address this potential resulting nose-down trim, which could **cause the flight crew to have difficulty controlling the airplane**, and lead to **excessive nose-down altitude, significant altitude loss, and possible impact with terrain**."

60.     The flight path of Lion Air flight 610 suggests that the malfunctioning AOA sensor and nose-down commands were a factor in the crash:

---

[22] https://www.nytimes.com/2019/03/20/world/africa/ethiopian-airlines-boeing.html
[23] https://www.nytimes.com/2019/03/20/world/asia/lion-air-crash-boeing.html



**How Lion Air flight 610's takeoff compares with a typical flight**

Altitudes in 10 minute period:

61. **BOEING** issued the Airworthiness Directive and began investigating a software patch to address the issue, but did not insist on further training of pilots to deal with the defective AOA sensor or MCAS software. **BOEING** also downplayed the significance of the threat presented by the MCAS and did not call for any aggressive action to prevent further incidents.

62. **BOEING** has maintained that the failure of the MCAS could be handled in the same way as a standard "stabilizer runaway," a malfunction which occurs when the Trimmable Horizontal Stabilizer (THS) on the aircraft tail fails to stop at the selected position and continues to deflect up or down.

63. Pilots and aviation experts have challenged **BOEING's** characterization because the MCAS failure does not behave like a runaway stabilizer. First, with a runaway

stabilizer, there is continuous uncommanded movement of the tail. In contrast, the movement of the tail is not continuous in a MCAS failure: pilots are able to counter the nose down movement, only to have the MCAS move the tail once again. Second, the MCAS alters the control column response to the stabilizer movement. Pulling back on the column normally interrupts any stabilizer nose-down movement, but with MCAS operating that control column function is disabled.[24]

64. **BOEING's** attempts to deflect blame onto purportedly poorly trained pilots wrongfully minimizes **BOEING's** responsibility for these crashes. It is foreseeable that pilots would be confused by MCAS' control over the 737 MAX 8 as the system's nose-down commands were different from a common stabilizer problem and because pilots were not told the MCAS existed or how it functioned. When seconds matter, the confusion caused by **BOEING's** defective and unsafe design, and failure to inform pilots, is the difference between life and death.

65. Both before and after the Lion Air crash, several pilots anonymously submitted on the Aviation Safety Reporting System ("ASRS") complaints which described similar flight control issues and unanticipated dives with the 737 MAX aircraft. One such report submitted by a pilot in November 2018 – after the Lion Air crash and before the **ETHIOPIAN AIRLINES** crash – describes the pilot's reaction to learning of the MCAS system:

> **"I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models.** The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone–even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.

---

[24] See https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa- missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

I am left to wonder: what else don't I know? **The Flight Manual is inadequate and almost criminally insufficient.** All airlines that operate the MAX must insist that Boeing incorporate ALL systems in their manuals."

66.     Shortly after Flight 610 crashed, and after learning of numerous complaints regarding similar close calls, **BOEING** knew that hundreds of its 737 MAX 8 aircraft were still in use carrying passengers all over the globe, which presented a substantial risk that a similar incident could occur without appropriate and immediate intervention.

67.     Despite this knowledge and the gravity of the risks presented to passengers, crew, and the public at large from imperiled airplanes flying overhead, **BOEING** consciously and intentionally failed to act, and/or acted without the urgency commensurate with the risk of harm presented by its defective and dangerous aircraft.

68.     Plaintiffs are informed and believe and on such information and belief allege that **BOEING** chose not to respond to the Flight 610 crash with the appropriate degree of urgency or with appropriate safety steps because it feared doing so would result in financial loss to **BOEING** if airlines grounded their aircraft or had to retrain their pilots. Instead, motivated by profit, **BOEING** downplayed the danger presented by its defective and dangerous aircraft, creating a false sense of security and ensuring that the 737 MAX 8 would still be utilized to carry passengers despite the presence of the defective and dangerous AOA sensor and MCAS.

**I.     ETHIOPIAN AIRLINES FLIGHT 302 CRASHES KILLING ALL 157 PEOPLE ON BOARD**

69.     On March 10, 2019, Flight 302 took off from Addis Ababa towards its destination of Nairobi, Kenya. Within one minute of its departure, the pilot calmly radioed that he was having flight control problems. Within three minutes, now panicked, the pilot requested permission to return back to Addis Ababa. The plane was accelerating abnormally and oscillating up and

down. Shortly thereafter, all communication with Flight 302 stopped and the plane violently

crashed into a field killing all 157 people aboard, including DECEDENTS.



By Scott Reinhard | Source: Path data from Flightradar24

70. The similarity between Flight 302 and the Flight 610 and data released to

date suggests that both aircraft experienced an erroneous AOA reading and activation of the

MCAS. On Flight 302, the aircraft's nose began to pitch down just 450 feet above the ground.

The jack screws from the horizontal tail stabilizer were recovered from both crashes and both

showed that the planes had been oriented in a dive with the nose pointing down. Both pilots

reported flight control issues and could not maintain a steady altitude or speed with similarly

erratic flight paths before crashing.

The following side-by-side comparison reveals the striking similarities between the

two doomed aircraft both in changes in altitude and vertical speed:



71.     Regulators finally decided to ground the 737 MAX aircraft in the wake of the Flight 302 crash to allow for a MCAS software upgrade and safety assessment to be conducted. The Department of Transportation, with assistance from the FBI, are now investigating the MAX's certification process, a federal grand jury probe has been empaneled, and Congressional hearings are underway.

72.     Whistleblowers have now come forward reporting that safety inspectors with the FAA, including those in the Aircraft Evaluation Group (AEG) responsible for evaluating the safety of the 737 MAX, lacked the proper training and certifications to do their jobs. To make matters worse, information obtained from whistleblowers purportedly indicates that the FAA was aware that its inspectors lacked proper training and certification as early as August 2018, well before the crashes of Flight 610 and Flight 302.

## V.  CLAIMS FOR RELIEF
### COUNT I  NEGLIGENCE

73.     **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as though fully set forth herein.

74.     At all relevant times hereinabove set forth, Defendant **BOEING** was the designer, manufacturer, distributor and/or seller of the **BOEING** 737 MAX 8 aircraft. Defendant **BOEING** was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger air transportation, including the subject **BOEING** 737 MAX 8 that crashed in Ethiopia on March 20, 2019.

75.     At all relevant times hereinabove set forth, Defendant **BOEING** operated, supervised, managed and/or oversaw the training facility that trained **ETHIOPIAN**

**AIRLINES**' pilots to fly the **BOEING** 737 MAX 8.

76.    At all times hereinabove set forth, **BOEING** breached its duty of care to **DECEDENT** as a passenger aboard Flight 302 with respect to the design, manufacture, inspection, testing, assembly, certification, distribution, and/or sale of a safe, airworthy aircraft; including the failure to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management and/or maintenance of the aircraft. **BOEING's** acts and/or omissions include, but are not limited to the following:

    a.    designing, manufacturing, assembling and/or certifying an aircraft with an anti-stall system controlled by a single AOA sensor which was susceptible to failure without redundant systems;

    b.    designing, manufacturing, assembling and/or certifying an aircraft with a flight control system susceptible to erroneous information from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than optional upgrades;

    c.    designing, manufacturing, assembling and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive;

    d.    marketing and selling the 737 MAX 8 as an analog to **BOEING's** 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the MAX 8 contained a new and potentially dangerous MCAS automated flight control system;

    e.    failing to provide adequate warning with regard to the 737 MAX 8's MCAS

and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive;

f.　failing to conduct a thorough and accurate safety assessment of the aircraft, including **BOEING's** failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and failure to account for the resetting of the automated dive after each command from a pilot;

g.　failing to properly train pilots on the new automated MCAS systems on the 737 MAX 8;

h.　failing to properly train pilots to identify an AOA sensor failure and MCAS input;

i.　failing to properly train pilots to disengage the stabilizer trim motor on the 737 MAX 8 in the event of an AOA sensor failure or unanticipated dive;

j.　designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives;

k.　designing, manufacturing, assembling and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive;

l.　failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610;

m.　failing to ground all 737 MAX 8 aircraft following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be

implemented;

n.  failing to properly warn pilots, airlines, and the public of the risk of
malfunctioning AOA sensors and automated MCAS dives following the crash
of Lion Air Flight JT 610.

77.  As a direct and legal result of Defendant **BOEING's** negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, **DECEDENT** died in the crash of Flight 302.

78.  As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFF** and the other heirs of **DECEDENT** have been damaged by the death of **DECEDENT**.

79.  As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFF** and the other heirs of **DECEDENT** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

80.  As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

81.  As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

82.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

83.     As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** and the other heirs of **DECEDENT** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFF** and the other heirs of **DECEDENT** and the imposition of all damages described above.

84.     Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** and the other heirs of **DECEDENT** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFF's** actual damages and **BOEING's** financial condition, yet sufficiently large

enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

## COUNT II
## BREACH OF WARRANTY

85.     **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as though fully set forth herein.

86.     **BOEING** was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8, and/or its component parts, involved in the subject crash.

87.     Prior to the crash of Flight 302, **BOEING** expressly and/or impliedly warranted and represented that the subject aircraft (the **BOEING** 737 MAX 8) including its component parts and instruments, and in conjunction with the instructions and warnings given by **BOEING**, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used. Additionally, **BOEING** further warranted that the subject aircraft, and its component parts, was free from all defects.

88.     **BOEING** breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **ETHOPIAN AIRLINES**.

89.     **DECEDENT**, as a passenger of Flight 302, was an intended third-party beneficiary of **BOEING's** warranties that Flight 302 (the **BOEING** 737 MAX 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

90.     **DECEDENT** reasonably relied on these warranties to **DECEDENT'S** detriment.

91.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFF** and the other heirs of **DECEDENT** have been damaged by the death of **DECEDENT**.

92.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFF** and the other heirs of **DECEDENT** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

93.     As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

94.     As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

95.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear

instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

96.     As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** and the other heirs of **DECEDENT** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFF** and the other heirs of **DECEDENT** and the imposition of all damages described above.

97.     Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** and the other heirs of **DECEDENT** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFF'S** and the other heirs of **DECEDENT** actual damages and **BOEING's** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

## COUNT III
## STRICT LIABILITY

98.     **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as though fully set forth herein.

99.     **BOEING** designed, manufactured, distributed and/or sold the **BOEING** 737 MAX 8, and its components parts, involved in the incident. **DEFENDANT** was in the business

of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger air transportation, including the subject **BOEING** 737 MAX 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

100. At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8 aircraft, and its component parts, was being operated by **ETHIOPIAN AIRLINES** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to **BOEING**.

101. At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of **BOEING's** defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft, and its component parts, as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to **ETHIOPIAN AIRLINES**.

102. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFF** and the other heirs of **DECEDENT** have been damaged by the death of **DECEDENT**.

103. As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFF** and the other heirs of **DECEDENT** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

104. As a further direct and legal result of the wrongful conduct of **BOEING** set forth

above, **PLAINTIFF** and the other heirs of **DECEDENT** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

105. As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

106. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

107. As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** and the other heirs of **DECEDENT** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFF** and the other heirs of **DECEDENT** and the imposition of all damages described above.

108.    Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** and the other heirs of **DECEDENT** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFF'S** and the other heirs of **DECEDENT** actual damages and **BOEING's** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

**COUNT IV**
**FAILURE TO WARN**

109.    **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as though fully set forth herein.

110.    Defendant **BOEING** designed, manufactured, distributed and/or sold the **BOEING** 737 MAX 8 involved in the incident. Defendant **BOEING** was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger air transportation, including the subject **BOEING** 737 MAX 8 that crashed in Ethiopia on March 10, 2019.

111.    At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8 aircraft was being operated by **ETHIOPIAN AIRLINES** and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Defendant **BOEING**.

112.    At all times relevant hereinabove set forth, the subject **BOEING** 737 MAX 8 was defective, dangerous, unsafe, and not airworthy by reason of Defendant **BOEING's** defective manufacture, design, warning systems, inspections, testing, service, and/or

maintenance of the subject aircraft as set forth above.

113. At all times relevant hereinabove set forth, **BOEING** had knowledge that the subject **BOEING** 737 MAX 8 was defective, dangerous, unsafe, and not airworthy, and in particular, **BOEING** had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

114. At all times relevant hereinabove set forth, the risks of failure of the **BOEING** 737 MAX 8 due the aircraft's unreasonably dangerous and defective design presented a substantial danger when the aircraft is used or misused in an intended or reasonably foreseeable way.

115. Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the aircraft's unreasonably dangerous and defective design.

116. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and imminent death, and **PLAINTIFF** and the other heirs of **DECEDENT** have been damaged by the death of **DECEDENT**.

117. As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFF** and the other heirs of **DECEDENT** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including

118. As a further direct and legal result of the wrongful conduct of **BOEING** set forth

above, **PLAINTIFF** and the other heirs of **DECEDENT** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

119. As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

120. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

121. As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** and the other heirs of **DECEDENT** have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and **BOEING's** conduct. A high degree of moral blame is attached to **BOEING's** conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFF** and all heirs of **DECEDENT** and the imposition of all damages described above.

34

122.     Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** and the other heirs of **DECEDENT** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFF's** and the other heirs actual damages and **BOEING's** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

## COUNT V
## CIVIL CONSPIRACY

123.     **PLAINTIFF** incorporates and re-alleges each of the paragraphs set forth above as though fully set forth herein.

124.     Defendant **BOEING** entered into an agreement with the FAA, and its agents, employees, and/or directors, and/or other persons and/or entities to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

125.     **BOEING** and its co-conspirators committed tortious and/or unlawful acts in furtherance of this agreement, including but not limited to, deceiving the public as to the safety of the 737 MAX 8 aircraft and its component parts and systems, certifying the aircraft and the MCAS manuals or informing pilots as to automated systems embedded in the 737 MAX 8 aircraft, denying technical experts the necessary time or resources to thoroughly evaluate the 737 MAX 8 aircraft, and compelling technical experts to certify the aircraft despite their concerns about the safety of the 737 MAX 8, all in violation of applicable laws, regulations, and mandatory duties.

126.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, **DECEDENT** suffered pre-impact injury and death, including fear of impending and

imminent death, and **PLAINTIFF** and the other heirs of **DECEDENTS** have been damaged by the death of **DECEDENT**.

127.     As a direct and legal result of the wrongful acts and/or omissions of Defendant **BOEING**, hereinabove alleged, **PLAINTIFF** and the other heirs of **DECEDENT** suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from **DECEDENT**, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

128.     As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

129.     As a further direct and legal result of the wrongful conduct of **BOEING** set forth above, **PLAINTIFF** and the other heirs of **DECEDENT** suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

130.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to **BOEING** for all of the aforementioned reasons, including but not limited to: **BOEING's** own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and **BOEING's** identification of a software upgrade to address problems with the AOA sensors

and MCAS in the weeks and  months prior to the crash of Flight 302.

131.    As set forth above and as will be shown by proof, there is a high degree of certainty that **PLAINTIFF** and the other heirs of **DECEDENT** have suffered those injuries and damages, and that there is an extremely close  connection between those injuries and damages and **BOEING'S** conduct.  A high degree of moral blame is attached to **BOEING'S** conduct, and the policy of preventing future harm justifies both  the recognition of the existence of a duty of care owed by **BOEING** to **PLAINTIFF** and all the heirs of **DECEDENT** and the  imposition of all damages described above.

132.    Based on the foregoing, **BOEING**, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that **PLAINTIFF** requests that the trier of fact, in the exercise of sound discretion, award **PLAINTIFF** additional damages for the sake of example and sufficient to punish **BOEING**, for its despicable conduct, in an amount reasonably related to **PLAINTIFF'S** actual damages and **BOEING'S** financial condition, yet sufficiently large enough to be an example to others and to deter **BOEING** and others from engaging in similar conduct in the future.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, **PLAINTIFF** prays for judgment against **DEFENDANT** as follows:

A.    For general damages in an amount according to proof at trial, and beyond the  jurisdictional minimum of this Court;

B.    For economic and property losses, in an amount according to proof at trial;

C.    For damages for the Estate of NORMAN TENDIS due to pre-impact injuries and losses;

D.    For interest upon any judgment entered as provided by law;

E.     For all costs of suit incurred herein;

F.     For such other and further relief as the court may deem just and proper.

WHEREFORE, **PLAINTIFF** prays for judgment against **DEFENDANT** on Counts I through V as follows:

**A.**     Punitive damages in an amount according to proof.

## VII.     <u>JURY DEMAND</u>

**PLAINTIFF** demands a trial by jury as to all claims in this action.

Dated:  January 27, 2020                                    Respectfully submitted,


                                               _____
                                               /s/Floyd A. Wisner
                                               Attorney For Plaintiff

                                               Wisner Law Firm, P.C.
                                               514 W. State Street
                                               Suite 200
                                               Geneva, Illinois  60134
                                               (630) 262-9434
                                               (630) 262-1066 (fax)
                                               faw@wisner-law.com
                                               IL Bar #3048713