**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RUTH WANJIKU KAGECHE and MARY NYAMBURA KAGECHE as Personal Representatives for the ESTATE OF FR. GEORGE MUKUA KAGECHE, Deceased<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>THE BOEING COMPANY, a Delaware Corporation; and ROSEMOUNT AEROSPACE, INC, a Delaware Corporation; and ROCKWELL COLLINS, INC., a Delaware corporation,<br><br>　　　　　　　Defendants. | In re: Ethiopian Airlines Flight ET 302 Crash<br><br>Lead Case:  1:19-CV-02170<br><br>Hon. Jorge L. Alonso<br><br>This filing applies to:<br><br>Case No. 1:19-CV-07701 |

**<u>DEFENDANT ROSEMOUNT AEROSPACE, INC.'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFFS' COMPLAINT AT LAW</u>**

NOW COMES Defendant, ROSEMOUNT AEROSPACE, INC. ("ROSEMOUNT"), by and

through its attorneys, FITZPATRICK & HUNT, PAGANO, AUBERT, LLP, and for its Answer and

Affirmative Defenses to Plaintiffs' Complaint at Law alleges and shows to the court as follows:

**<u>PARTIES</u>**

1.　　　This is an action for damages pursuant to the Illinois Wrongful Death Act, 740 Ill.
Comp. Stat. 180/1 *et seq.*, Illinois Product Liability Act, 735 Ill. Comp. Stat. 5/13-213, or any other
applicable law, based on the defective design and the inadequate warnings of the Boeing 737 Max.

**<u>ANSWER:</u>** ROSEMOUNT admits only that Plaintiffs' Complaint alleges various claims

against ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief

as to the truth of the remaining allegations of Paragraph 1 and on that basis denies same.

2.　　　Ruth Wanjiku Kageche and Mary Nyambura Kageche have been appointed as the
Personal Representatives for the Estate of Fr. George Mukua Kageche by the Senior Principal
Magistrate's Court at Githunguri, Republic of Kenya. See Exhibit A (Limited Grant Ad Litem).

**ANSWER:** Upon information and belief, ROSEMOUNT admits that Ruth WANJIKU KAGECHE AND MARY NYAMBURA KAGECHE were appointed as the Personal Representatives for the ESTATE OF FR. GEORGE MUKUA KAGECHE. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 2 and on that basis denies same.

3. Fr. George Mukua Kageche, a Catholic priest, died in the crash of Ethiopian Airlines Flight 302 on March 10, 2019.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 3 and on that basis denies same.

4. The Decedent's only surviving heirs are his sisters, Ruth Wanjiku Kageche and Mary Nyambura Kageche.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 4 and on that basis denies same.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332(a)(2) based on diversity of citizenship because the matter in controversy exceeds the sum or value of $75,000, inclusive of interest and costs, and arises between citizens of U.S. states and citizens of foreign states.

**ANSWER:** The allegations contained in Paragraph 5 state conclusions of law to which no response is required. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 5 and on that basis denies same.

6. Venue is proper in the Northern District of Illinois: pursuant to 28 U.S.C §1391(b)(1) because Boeing is and has, at all relevant times, been a citizen and resident of the State of Illinois. Boeing's corporate headquarters and principal place of business are located in this judicial district at 100 North Riverside, Chicago, Cook County, Illinois 60606; At all relevant times, Defendant Boeing Company is a Delaware corporation with its principal place of business and corporate headquarters in Chicago, Illinois. Boeing has been authorized to do business and has been transacting or conducting business within the State of Illinois. *See* 735 Ill. Comp. Stat. 5/2-209(b)(4).

**ANSWER:** The allegations contained in Paragraph 6 state conclusions of law to which no response is required. To the extent the allegations contained in Paragraph 6 are directed at another entity, no response is required. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 6 and on that basis denies same.

7.     At all times relevant to this complaint, Defendant Boeing was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing and selling commercial aircrafts as well as providing information and warnings about such aircrafts, including the aircraft at issue, the Boeing 737 Max.

**ANSWER:** The allegations contained in Paragraph 7 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 7 and on that basis denies same.

8.     Pursuant to 28 U.S.C. §1391(b)(3) because Rosemount, located in Burnsville, Minnesota, transacted and continues to transact regular and substantial business with Chicago-based Boeing in Cook County, Illinois; and pursuant to 28 U.S.C. §1391(b)(2) was engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Angle of Attack sensor ("AOA sensor") which was affixed to the aircraft at issue, the Boeing 737 Max.

**ANSWER:** The allegations contained in Paragraph 8 state conclusions of law to which no response is required. To the extent a response is required, ROSEMOUNT denies that it transacts regular and substantial business in Cook County, Illinois. Further answering, ROSEMOUNT admits that it offers a wide range of products for pneumatic measurements of air data parameters, including, *inter alia*, angle of attack sensors designed, manufactured, and tested for use in aircraft manufactured by Boeing in accordance with Boeing's requirements, including the Boeing 737 MAX 8 aircraft at issue. ROSEMOUNT further admits that its principal place of business is in the State of Minnesota. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 8 and on that basis denies same.

3

9.      Pursuant to 28 U.S.C. §1391(b)(3) ROCKWELL COLLINS, INC., a Delaware corporation, is located in Cedar Rapids, Iowa.

**ANSWER:** The allegations contained in Paragraph 9 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 9 and on that basis denies same.

10.     At all times relevant to this complaint, Defendant Collins was engaged in the business of designing, programming, manufacturing, assembling, testing, servicing, marketing, promoting, and supplying as well as providing information and warnings about the Maneuvering Characteristics Augmentation System ("MCAS system") which was installed on the aircraft at issue, the Boeing 737 Max.

**ANSWER**: The allegations contained in Paragraph 10 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 10 and on that basis denies same.

**FACTS**

11.     The facts of this case highlight a series of actions taken by Boeing to put profit over the lives of children, women and men. In an effort to compete with Airbus's new fuel-efficient Neo aircraft, Defendant Boeing rushed an aircraft to market that was not airworthy and then concealed its defects in order to sell more airplanes. That aircraft is the Boeing 737 Max 8 ("Max 8").

**ANSWER:** The allegations contained in Paragraph 11 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 11 and on that basis denies same.

12.     Boeing opted to build the Max 8 because it would be quicker, easier, and cheaper than starting from scratch, and would provide fuel savings for airlines.

**ANSWER:** The allegations contained in Paragraph 12 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 12 and on that basis denies same.

13. Boeing produced sloppy blueprints for the Max 8 and told a technician that instructions would be cleaned up later in the process.

**ANSWER:** The allegations contained in Paragraph 13 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 13 and on that basis denies same.

14. Boeing set a ground rule for engineers: Limit changes to hopefully avert a requirement that pilots spend time training in a flight simulator before flying the Max 8.

**ANSWER:** The allegations contained in Paragraph 14 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 14 and on that basis denies same.

15. Boeing marketed the Max 8 to airlines telling them that it will also reduce costs on training pilots who already were licensed to fly the Boeing 737.

**ANSWER:** The allegations contained in Paragraph 15 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 15 and on that basis denies same.

16. Boeing trained the Max 8 pilots using an iPad.

**ANSWER:** The allegations contained in Paragraph 16 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT

lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 16 and on that basis denies same.

17.     To improve the fuel efficiency of their new jet, Boeing put new engines on the Max 8.

**ANSWER:** The allegations contained in Paragraph 17 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 17 and on that basis denies same.

18.     The new engines were bigger than the 737 NG engines and Boeing had to change the mounting point of the engine.

**ANSWER:** The allegations contained in Paragraph 18 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 18 and on that basis denies same.

19.     Boeing put the Max 8 engines further forward and higher on the wings than on the 737 NG.

**ANSWER:** The allegations contained in Paragraph 19 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 19 and on that basis denies same.

20.     The different mounting point made the Max 8 prone to aerodynamic stall. The engine positions on the wings gives the Max 8 a tendency to pitch up under high power.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 20 and on that basis denies same.

21. In order to prevent an aerodynamic stall Boeing and Collins developed software which told the flight control system to change its angle of attack downward if a stall risk is perceived. This is known as Maneuvering Characteristics Augmentation System ("MCAS").

**ANSWER:** The allegations contained in Paragraph 21 are directed at other entities and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 21 and on that basis denies same.

22. On the Max 8, if a stall risk is perceived the computer on the aircraft automatically initiates a downward pitch angle.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 22 and on that basis denies same.

23. Boeing intentionally omitted information about the MCAS system from its Max 8 flight manual and training materials, leaving pilots ignorant of its very existence.

**ANSWER:** The allegations contained in Paragraph 23 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 23 and on that basis denies same.

24. An Angle of Attack (AOA) sensor, designed and manufactured by Rosemount, was affixed to the Max 8 and designed to tell the flight control system if a stall risk is perceived. The Rosemount AOA sensor was prone to failure and to providing false data.

**ANSWER:** ROSEMOUNT admits that it offers a wide range of products for pneumatic measurements of air data parameters, including, inter alia, angle of attack sensors designed, manufactured, and tested for use in aircraft manufactured by Boeing in accordance with Boeing's requirements, including the Boeing 737 MAX 8 aircraft. ROSEMOUNT denies the remaining allegations of Paragraph 24.

25. Boeing intentionally designed the flight control system to rely upon data from one single sensor on the Max 8 in order to prevent more in-depth training, making it easier to sell its

aircraft to airlines. Boeing's selling point was that the Max 8 would only require "distance learning" using an iPad, with no down time for crew to train on simulators.

**ANSWER:** The allegations contained in Paragraph 25 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 25 and on that basis denies same.

26.    Boeing provided some airlines with an "optional" feature allowing the flight control system to obtain information from two different AOA sensors. In this optional configuration if one AOA sensor receives data that does not agree with data received by the other sensor, the MCAS does not command a pitch down of the aircraft.

**ANSWER:** The allegations contained in Paragraph 26 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 26 and on that basis denies same.

27.    In a Max 8 configured in the standard manner there are two AOA sensors but the Flight Control System only receives data from one AOA sensor. But if one AOA sensor receives bad data, falsely indicating a stall, the aircraft will pitch nose down and can crash.

**ANSWER:** Upon information and belief, ROSEMOUNT admits that the Max 8 was configured with two AOA sensors. ROSEMOUNT denies that any component designed, manufactured or sold by ROSEMOUNT was defective or otherwise sent bad or false data due to any act or omission by ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 27 and on that basis denies same.

28.    The subject aircraft did not contain the optional feature. It relied upon data from one AOA sensor even though it had two AOA sensors.

**ANSWER:** Upon information and belief, ROSEMOUNT admits that the subject aircraft was equipped with two AOA sensors. ROSEMOUNT lacks sufficient knowledge or information

to form a belief as to the truth of the remaining allegations of Paragraph 28 and on that basis denies same.

29.     The angle of attack sensor is depicted below: [graphic omitted]

**ANSWER:** Upon information and belief, ROSEMOUNT admits that the images depict an angle of attack sensor. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the make/model of angle of attack sensor depicted or whether it is the same as that installed on the subject aircraft, and on that basis denies same.

30.     The horizontal stabilizer on the Max 8 is positioned by a single electric trim motor controlled through either the stab trim switches on the control wheel, autopilot trim or through the MCAS system. The stabilizer may also be positioned by manually rotating the stabilizer trim wheel.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 30 and on that basis denies same.

31.     Switches on each control wheel actuate the electric trim motor through the main electric stabilizer trim circuit when the aircraft is flown manually. With the autopilot engaged, stabilizer trim is accomplished through the autopilot stabilizer trim circuit. The main electric and autopilot stabilizer trim have two speed modes: high speed with flaps extended and low speed with flaps retracted. If the autopilot is engaged, actuating either pair of stabilizer trim switches automatically disengages the autopilot. The stabilizer trim wheels rotate whenever electric stabilizer trim is actuated.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 31 and on that basis denies same.

32.     The STAB TRIM PRI cutout switch and the STAB TRIM B/U cutout switch on the Max 8 are located on the control stand. If either switch is positioned to CUTOUT, both the autopilot and main electric trim inputs are disconnected from the stabilizer trim motor.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 32 and on that basis denies same.

33.     The control column actuated stabilizer trim cutout switches on the Max 8 stop operation of the main electric and autopilot trim when the control column movement opposes trim

direction. This is not true for pitch commands for the MCAS. When the STAB TRIM override switch is positioned to OVRD, electric trim can be used regardless of control column position.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 33 and on that basis denies same.

34.      Pitch trim is controlled by changing the pitch of the horizontal stabilizer. Changing pitch of the horizontal stabilizer can place large pitch forces on the aircraft. When applied appropriately, these forces can keep the aircraft in balance. When applied inappropriately, they can make the aircraft difficult to handle.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 34 and on that basis denies same.

35.      Forces generated by the horizontal stabilizer from an out of trim condition can exceed the forces that can be generated by the elevator.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 35 and on that basis denies same.

36.      It is possible on the Max 8, to have an out of trim condition that when countered by elevator control inputs from the crew, puts enough load on the pitch trim mechanism that it essentially jams the pitch trim control. Manual trim cannot overcome this load on the mechanism.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 36 and on that basis denies same.

37.      The elevator is a smaller control surface when compared to the surface area of the controllable horizontal stabilizer.

**ANSWER:**  ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 37 and on that basis denies same.

38.      This scenario is depicted by the illustration below: [graphic omitted]

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 38 and on that basis denies same.

39.      Electric trim works in a narrower range of motion than manual trim. If the stabilizer is out of trim and outside the range of electric trim operation, only manual trim can be used.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 39 and on that basis denies same.

40.     In addition to its failure to warn, create a provide instructions [sic] to pilot and train pilots on the MCAS system and how to override the Flight Control System when it is provided with false AOA data, Boeing designed a pitch trim control system that is capable of jamming.

**ANSWER:** The allegations contained in Paragraph 40 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT denies that any component designed, manufactured or sold by ROSEMOUNT was defective or otherwise sent false data due to any act or omission by ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 40 and on that basis denies same.

## CRASH OF ETHIOPIAN AIRLINES FLIGHT 302

41.     On March 10, 2019 Fr. George Mukua Kageche was a fare paying passenger onboard a Boeing 737-8 (Max) aircraft, ET-AVJ, Serial Number 62450, with an intended destination of Nairobi, Kenya.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 41 and on that basis denies same.

42.     At 05:38 UTC, Ethiopian Airlines flight 302, Boeing 737-8(Max), ET-AVJ, took off from Addis Ababa Bole Int. Airport bound to Nairobi, Kenya Jomo Kenyatta Int. Airport. Shortly after takeoff, the Angle of Attack sensor that recorded that value became erroneous and the left stick shaker activated and remained active until near the end of the flight. In addition, the airspeed and altitude values from the left air data system began deviating from the corresponding right side values. The Captain requested to return back to the departure airport. The aircraft crashed at 5:44 UTC 28 NM South East of Addis Ababa near Ejere village. There were 157 passengers and crew on board. All were fatally injured, and the aircraft was destroyed.

**ANSWER:** ROSEMOUNT admits that a Boeing 737-8 MAX, operated by Ethiopian Airlines as Flight 302, departed from Bole International Airport in Addis Ababa, Ethiopia and was involved in an accident shortly after takeoff resulting in the deaths of all occupants. Further

answering, ROSEMOUNT denies that any component designed or manufactured by ROSEMOUNT was defective or otherwise transmitted erroneous values due to any act or omission by ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 42 and on that basis denies same.

43.     Just one minute into the flight the Captain, Yared Getachew, reported that the crew was having flight-control problems. The anti-stall system then kicked in and pushed the nose of the aircraft down for nine seconds. Instead of climbing, the aircraft descended slightly. Audible warnings — "Don't Sink" — sounded in the cockpit. The pilots fought to turn the nose of the plane up, and briefly they were able to resume climbing. The MCAS system pushed the nose down again, triggering more squawks of "Don't Sink" from the plane's ground-proximity warning system. The pilots then flipped two switches and disconnected the anti-stall system, then tried to regain control. They asked to return to the airport but were continuing to struggle getting the aircraft to gain altitude. Power to controls was returned. The MCAS engaged again, pushing the plane into a nose dive. Thirty seconds later the cockpit voice recording ended, the plane crashed, and all 157 people on board were killed. The aircraft's impact created a 30 meter deep crater.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 43 and on that basis denies same.

44.     According to a preliminary report issued by the Ethiopian Aircraft Accident Investigation Bureau, the following is what occurred, minute by minute.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 44 and on that basis denies same. Further answering, ROSEMOUNT states that, upon information and belief, the official investigation into this loss is ongoing.

45.     At 05:38:44, shortly after liftoff, the left and right recorded AOA values deviated. The left AOA decreased to 11.1 degrees then increased to 35.7 degrees while the value of the right AOA indicated 14.94 degrees. Then the left AOA value reached 74.5 degrees in ¾ seconds while the right AOA reached a maximum value of 15.3 degrees. At this time, the left stick shaker activated and remained active until near the end of the recording. Also, the airspeed, altitude and flight director pitch bar values from the left side noted deviating from the corresponding right side values. The left side values were lower than the right side values until near the end of the recording.

**ANSWER:** ROSEMOUNT denies that any component designed or manufactured by ROSEMOUNT was defective or otherwise transmitted erroneous values due to any act or omission

by ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 45 and on that basis denies same.

46.     At 05:38:43 and about 50 ft radio altitude, the flight director roll mode changed to LNAV. At 05:38:46 and about 200 ft radio altitude, the Master Caution parameter changed state. The First Officer called out Master Caution Anti-Ice on CVR. Four seconds later, the recorded Left AOA Heat parameter changed state.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 46 and on that basis denies same.

47.     At 05:38:58 and about 400 ft radio altitude, the flight director pitch mode changed to VNAV SPEED and the Captain called out "Command" (standard call out for autopilot engagement) and an autopilot warning is recorded. At 05:39:00, the Captain called out "Command". At 05:39:01 and about 630 ft radio altitude, a second autopilot warning is recorded.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 47 and on that basis denies same.

48.     At 05:39:06, the Captain advised the First-Officer to contact radar and the First Officer reported SHALA 2A departure crossing 8400 ft and climbing FL 320. Between liftoff and 1000 ft above ground level (AGL), the pitch trim position moved between 4.9 and 5.9 units in response to manual electric trim inputs. At 1000 ft AGL, the pitch trim position was at 5.6 units. At 05:39:22 and about 1,000 feet the left autopilot (AP) was engaged (it disengaged about 33 seconds later), the flaps were retracted and the pitch trim position decreased to 4.6 units. Six seconds after the autopilot engagement, there were small amplitude roll oscillations accompanied by lateral acceleration, rudder oscillations and slight heading changes. These oscillations continued also after the autopilot was disengaged. At 05:39:29, radar controller identified ET-302 and instructed to climb FL 340 and when able right turns direct to RUDOL and the First-Officer acknowledged.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 48 and on that basis denies same.

49.     At 05:39:42, Level Change mode was engaged. The selected altitude was 32000 ft. Shortly after the mode change, the selected airspeed was set to 238 kt.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 49 and on that basis denies same.

50.     At 05:39:45, the Captain requested flaps up and the First-Officer acknowledged.

One second later, the flap handle moved from 5 to 0 degrees and flaps retraction began. At 05:39:50, the selected heading started to change from 072 to 197 degrees and at the same time the Captain asked the First-Officer to request to maintain runway heading.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 50 and on that basis denies same.

51.     At 05:39:55, Autopilot disengaged, at 05:39:57, the Captain advised the First-Officer to request to maintain runway heading and that they were having flight control problems. At 05:40:00 shortly after the autopilot disengaged, the FDR recorded an automatic aircraft nose down (AND) activated for 9.0 seconds and pitch trim moved from 4.60 to 2.1 units. The climb was arrested and the aircraft descended slightly.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 51 and on that basis denies same.

52.     At 05:40:03 the Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred. At 05:40:05, the First-Officer reported to ATC that they were unable to maintain SHALA 1A and requested runway heading which was approved by ATC.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 52 and on that basis denies same.

53.     At 05:40:06, left and right flap position reached a recorded value of 0.019 degrees which remained until the end of the recording. The column moved aft and a positive climb was re-established during the automatic AND motion. At 05:40:12, approximately three seconds after AND stabilizer motion ends, electric trim (from pilot activated switches on the yoke) in the Aircraft nose up (ANU) direction is recorded on the DFDR and the stabilizer moved in the ANU direction to 2.4 units. The Aircraft pitch attitude remained about the same as the back pressure on the column increased.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 53 and on that basis denies same.

54.     At 05:40:20, approximately five seconds after the end of the ANU stabilizer motion, a second instance of automatic AND stabilizer trim occurred and the stabilizer moved down and reached 0.4 units.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 54 and on that basis denies same.

55.     From 05:40:23 to 05:40:31, three Ground Proximity Warning System (GPWS) "DON'T SINK" alerts occurred.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 55 and on that basis denies same.

56.     At 05:40:27, the Captain advised the First-Officer to trim up with him. At 05:40:28 Manual electric trim in the ANU direction was recorded and the stabilizer reversed moving in the ANU direction and then the trim reached 2.3 units.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 56 and on that basis denies same.

57.     At 05:40:35, the First-Officer called out "stab trim cut-out" two times. The Captain agreed and the First Officer confirmed stab trim cut-out. At 05:40:41, approximately five seconds after the end of the ANU stabilizer motion, a third instance of AND automatic trim command occurred without any corresponding motion of the stabilizer, which is consistent with the stabilizer trim cutout switches were in the "cutout'' position.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 57 and on that basis denies same.

58.     At 05:40:44, the Captain called out three times "Pull-up" and the First-Officer acknowledged. At 05:40:50, the Captain instructed the First Officer to advise ATC that they would like to maintain 14,000 ft and they had a flight control problem. At 05:40:56, the First-Officer requested ATC to maintain 14,000 ft and reported that they were having a flight control problem. ATC approved.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 58 and on that basis denies same.

59.     From 05:40:42 to 05:43:11 (about two and a half minutes), the stabilizer position gradually moved in the AND direction from 2.3 units to 2.1 units. During this time, aft force was applied to the control columns which remained aft of neutral position. The left indicated airspeed increased from approximately 305 kt to approximately 340 kt (VMO). The right indicated airspeed was approximately 20-25 kt higher than the left. The data indicates that aft force was applied to both columns simultaneously several times throughout the remainder of the recording.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 59 and on that basis denies same.

60.     At 05:41:20, the right overspeed clacker was recorded on Cockpit Voice Recorder. It remained active until the end of the recording. At 05:41:21, the selected altitude was changed from 32000 ft to 14000 ft. At 05:41:30, the Captain requested the First-Officer to pitch up with him and the First-Officer acknowledged.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 60 and on that basis denies same.

61.     At 05:41:32, the left overspeed warning activated and was active intermittently until the end of the recording. At 05:41:46, the Captain asked the First-Officer if the trim was functional. The First-Officer has replied that the trim was not working and asked if he could try it manually. The Captain told him to try.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 61 and on that basis denies same.

62.     At 05:41:54, the First-Officer replied that it was not working. At 05:42:10, the Captain asked and the First-Officer requested a vector to return and ATC approved.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 62 and on that basis denies same.

63.     At 05:42:30, ATC instructed ET-302 to turn right heading 260 degrees and the First-Officer acknowledged. At 05:42:43, the selected heading was changed to 262 degrees. At 05:42:51, the First-Officer mentioned Master Caution Anti-Ice. The Master Caution is recorded on DFDR.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 63 and on that basis denies same.

64.     At 05:42:54, both pilots called out "left alpha vane". At 05:43:04, the Captain asked the First Officer to pitch up together and said that pitch is not enough. At 05:43:11, about 32 seconds before the end of the recording, at approximately 13,4002 ft [sic], two momentary manual electric trim inputs are recorded in the ANU direction. The stabilizer moved in the ANU direction from 2.1 units to 2.3 units.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 64 and on that basis denies same.

65.     At 05:43:20, approximately five seconds after the last manual electric trim input, an AND automatic trim command occurred and the stabilizer moved in the AND direction from

2.3 to 1.0 unit in approximately 5 seconds. The aircraft began pitching nose down. Additional simultaneous aft column force was applied, but the nose down pitch continued, eventually reaching 40 degrees nose down. The stabilizer position varied between 1.1 and 0.8 units for the remainder of the recording. The left Indicated Airspeed increased, eventually reaching approximately 458 kts and the right Indicated Airspeed reached 500 kts at the end of the recording. The last recorded pressure altitude was 5,419 ft on the left and 8,399 ft on the right.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 65 and on that basis denies same.

66.    Data from the Flight Data Recorder on the aircraft can be seen below: [graphic omitted]:

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 66 and on that basis denies same.

## BACKGROUND FACTS

67.    Prior to the loss of all One Hundred and Fifty-Seven (157) lives in the Ethiopian Airlines Crash of March 10, 2019 Boeing was put on notice that its Max 8 aircraft was defective and dangerous and concealed these defects in order to sell more of the Max 8 airplanes.

**ANSWER:** The allegations contained in Paragraph 67 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 67 and on that basis denies same.

68.    Boeing was put on notice time and time again that the Max 8 was unreasonably dangerous but failed to rectify the flawed design, failed to provide adequate working sensors or software fixes, failed to provide working warnings or alarms, failed to install, design or retrofit its aircraft with adequate sensors and failed to provide adequate warnings or training about the danger. For Example:

**ANSWER:** The allegations contained in Paragraph 68 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 68 and on that basis denies same.

69.    **Max 8 Danger Warning Number 1:** In 2006 the Future Aviation Safety Team ("FAST") published a 50 page study on "Increasing Reliance on Flight Deck Automation," after conducting a pilot survey among more than 190 pilot respondents, with a mean of 10,000 flying hours and 20 years in the business. The top five hazards FAST identified with emerging autonomous flight systems included the following four out of five hazards all of which are applicable to the Max 8 MCAS and AOA sensor system:

      a.    Failure of the flight crew to remain aware of automation mode and aircraft energy state;

      b.    Unfamiliar modes of aircraft automation may result in a perfectly normal flying aircraft suddenly taking on characteristics that the pilot has seldom or never previously encountered;

      c.    Latent flaws in the displays or primary flight control system may go undetected, because not enough human-in-the-loop testing is performed;

      d.    Pilots may not be adequately trained to understand the philosophy of the automation design when the functionality is being automatically degraded in particular situations for reasons known only to the software.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 69, including subparagraphs (a) – (d), and on that basis denies same.

70.    Despite the 2006 FAST report Boeing designed and used an automated flight system that it did not disclose to pilots. It used data from a single sensor that caused the aircraft to take on characteristics that the pilot did not previously encounter. Boeing intentionally did not train pilots to have notice that the aircraft might take on such characteristics nor what to do about it.

**ANSWER:** The allegations contained in Paragraph 70 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 70 and on that basis denies same.

71.    Boeing designed an MCAS system with no Human in the Loop. HITL is defined as a model that requires human interaction. In HITL systems a human is always part of the simulation and consequently influences the outcome in such a way that is difficult to reproduce. Boeing failed to adequately train pilots about the existence of MCAS and then failed to inform pilots about how the system worked such that they could interact with it or override it.

**ANSWER:** The allegations contained in Paragraph 71 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 71 and on that basis denies same.

72.     **Max 8 Safety Notice Number 2:** The crash of Turkish Airlines Flight 1951 in 2009, ten years prior to the Ethiopian Airlines Crash, demonstrated the risks of an automated flight-control system relying on data from a single sensor.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 72 and on that basis denies same.

73.     Investigators of the 2009 crash of a Turkish Airlines jet identified a faulty altitude sensor that thought the plane was closer to the ground than it was and triggered the engines to idle. The plane's second radio altimeter displayed the correct elevation, but it didn't matter: the automatic throttle was tied to the first gauge. The Amsterdam-bound plane crashed into a field, killing nine people and injuring 120.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 73 and on that basis denies same.

74.     Boeing ended up changing that throttle system to prevent one erroneous altitude reading from cascading into tragedy, changes the U.S. Federal Aviation Administration subsequently made mandatory.

**ANSWER:** The allegations contained in Paragraph 74 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 74 and on that basis denies same.

75.     The Turkish Airlines Crash, which injured and killed some of its own Boeing employees who happened to be on the flight, provided clear notice that relying upon one data point to provide information to the flight control system can be fatal.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 75 and on that basis denies same.

76.     **Max 8 Safety Notice Number 3**: Lion Air 610 Crash of October 29, 2018. One Hundred and Eighty-Nine (189) lives were lost when a Max 8 crashed. Investigators quickly concluded that the MCAS system on the aircraft was activated resulting from erroneous angle of attack (AOA) information and the pilots were without an optional feature that would have alerted them to the error. This is the single biggest notice that Boeing had that its Max 8 aircraft was defective and dangerous yet it concealed these defects in order to sell more of the Max 8 airplanes.

**ANSWER:** ROSEMOUNT admits only that Lion Air Flight 610 was involved in an accident on October 29, 2018 (local time) resulting in the death of all people on board. Further answering, ROSEMOUNT denies that any component designed or manufactured by ROSEMOUNT was defective or otherwise transmitted erroneous information due to any act or omission by ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 76 and on that basis denies same. Further answering, ROSEMOUNT states that Plaintiffs' Decedent was not a passenger on Flight JT610 and, as such, any allegations regarding the facts or circumstances of that incident may not have any direct bearing on the Plaintiffs' claims against ROSEMOUNT.

77.     Boeing delivered the subject crashed Max 8 to Ethiopian Airlines after the Lion Air Crash. It flew the aircraft from Boeing Field in Seattle, Washington to Dublin, Ireland on November 15, 2018, delivering the aircraft in Addis Ababa on November 17, 2018. [graphic omitted]

**ANSWER:** The allegations contained in Paragraph 77 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 77 and on that basis denies same.

78.     Only after the Lion Air Crash and the loss of 189 lives did Boeing tell different airlines months apart from one another that cockpit alerts for the AOA sensors did not work on the Max 8 due to a software error.

**ANSWER:** The allegations contained in Paragraph 78 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT

lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 78 and on that basis denies same.

79.    Boeing told Southwest Airlines about the problem in late November 2018 and began installing additional cockpit warning systems by late November.

**ANSWER:** The allegations contained in Paragraph 79 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 79 and on that basis denies same.

80.    Boeing told United Continental Holdings, Inc. about the software error toward the end of March, four months after Southwest and after the crash of Ethiopian Airlines Flight 302.

**ANSWER:** The allegations contained in Paragraph 80 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 80 and on that basis denies same.

81.    **Max 8 Safety Notice Number 4:** In 2017 Boeing engineers learned that alerts were not operating as intended on the Max 8 due to a software error. Instead of telling the Federal Aviation Administration or the airlines or pilots, it concealed this problem.

**ANSWER:** The allegations contained in Paragraph 81 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 81 and on that basis denies same.

82.    **Max 8 Safety Notice Number 5:** During the action design [sic] of the Max 8 Boeing intentionally chose to use a single point failure system, without redundancies. In aviation design it is essential to have a fail safe or backup. Boeing violated this simple aviation safety rule. Boeing engineers and managers noticed that this fundamental rule was being violated but did nothing.

**ANSWER:** The allegations contained in Paragraph 82 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 82 and on that basis denies same.

83. Boeing chose not to make the MCAS system redundant in order to make the Max 8 cheaper for training purposes, in order to sell more airplanes.

**ANSWER:** The allegations contained in Paragraph 83 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 83 and on that basis denies same.

84. Rick Ludtke, a former Boeing engineer who worked on designing the interfaces on the Max 8's flight deck, said managers mandated that any differences from the previous 737 had to be small enough that they wouldn't trigger the need for pilots to undergo new simulator training.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 84 and on that basis denies same.

85. According to Mr. Ludtke, if the group had built the MCAS in a way that would depend on two sensors, and would shut the system off if one fails, he thinks the company would have needed to install an alert in the cockpit to make the pilots aware that the safety system was off. And if that happens, Ludtke said, the pilots would potentially need training on the new alert and the underlying system. That could mean simulator time, which was off the table."

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 85 and on that basis denies same.

## BOEING FALSIFIED AND OMMITTED [SIC] INFORMATION FROM PILOTS AND AIRLINES

86. Boeing concealed information about the MCAS system from its customers and passengers.

**ANSWER:** The allegations contained in Paragraph 86 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT

lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 86 and on that basis denies same.

87.     Boeing purposefully concealed information about the MCAS system in order to sell more aircraft.

**ANSWER:** The allegations contained in Paragraph 87 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 87 and on that basis denies same.

88.     Boeing affirmatively omitted information about the MCAS system from its Flight Control Manual on the Max 8.

**ANSWER:** The allegations contained in Paragraph 88 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 88 and on that basis denies same.

89.     Boeing affirmatively chose not to instruct or train pilots on the MCAS system, in order to sell more Max 8 airplanes.

**ANSWER:** The allegations contained in Paragraph 89 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 89 and on that basis denies same.

90.     After the public and pilots questioned the safety of the Max 8 Boeing continued to conceal and omit information about the safety of the Max 8, in order to sell more aircraft.

**ANSWER:** The allegations contained in Paragraph 90 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT

lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 90 and on that basis denies same.

91.     After the public and pilots questioned the safety of the training for the Max 8, which does not rely upon simulator training, Boeing continued to downplay the need for simulator training, in order to sell more aircraft.

**ANSWER:** The allegations contained in Paragraph 91 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 91 and on that basis denies same.

## BOEING CONSPIRED WITH THE FEDERAL AVIATION ADMINISTRATION

92.     Federal Aviation Administration safety engineers worked under constant pressure from their managers to delegate more and more work to Boeing itself, and to speedily approve the Max 8 safety assessments the Boeing designees came up with.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 92 and on that basis denies same.

93.     Boeing removed a senior engineer acting as an FAA Authorized Representative who raised questions about the speed with which the FAA was being asked to approve Boeing's changes to the Max 8.

**ANSWER:** The allegations contained in Paragraph 93 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 93 and on that basis denies same.

94.     Federal Aviation Administration (FAA) engineers in Renton worked in a negative work environment created by FAA managers where safety engineers feared retaliation for attempting to hold Boeing accountable.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 94 and on that basis denies same.

95.     According to the Seattle Times, the culture at the Renton, Washington aircraft certification office involved delegating more than the FAA technical specialists were comfortable with. When the FAA's safety engineers had an opinion different from Boeing's, FAA management in the office tended to side with Boeing.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 95 and on that basis denies same.

96.     The current procedure under which aircraft are certified creates a system that is vulnerable to undue pressure and control from the aircraft manufacturer. This diagram from the Seattle Times illustrates the difference between how aircraft used to be certified to be allowed to be sold and flown and the current certification process. [graphic omitted]

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 96 and on that basis denies same.

97.     Boeing took advantage of this system in order to rush a dangerous airplane to market in order to compete with Airbus and increase its revenue.

**ANSWER:** The allegations contained in Paragraph 97 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 97 and on that basis denies same.

98.     The FAA worked with Boeing to assist it in its abuse of this system and allowed a dangerous aircraft to be marketed, sold and flown globally.

**ANSWER:** The allegations contained in Paragraph 98 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 98 and on that basis denies same.

## FACTS ABOUT BOEING

99.     Boeing markets itself as "the world's largest aerospace company and leading manufacturer of commercial jetliners" and claims "a long tradition of aerospace leadership and innovation" including "creating advanced technology solutions."

**ANSWER:** The allegations contained in Paragraph 99 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 99 and on that basis denies same.

100. With corporate headquarters in Chicago, Boeing employs more than 165,000 people across the United States and in more than 65 countries.

**ANSWER:** The allegations contained in Paragraph 100 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 100 and on that basis denies same.

101. Boeing claims it has "one of the most diverse, talented and innovative workforces anywhere."

**ANSWER:** The allegations contained in Paragraph 101 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 101 and on that basis denies same.

102. In Boeing's 2018 Annual Report, its reported annual revenue was $101.1 billion in revenue.

**ANSWER:** The allegations contained in Paragraph 102 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 102 and on that basis denies same

103. Despite these resources, the Max 8 aircraft at issue was not equipped with appropriate sensors, warning systems, software, or a trim system to warn or protect the people on board that airplane from a computer initiated crash into terrain that resulted in a crater 30 meters deep.

**ANSWER:** ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 103 and on that basis denies same.

104.    Despite these resources Boeing shifted the cost of Max 8 pilot training to the airlines and designed its aircraft in an unsafe manner to create a selling point- cheap training for flight crews.

**ANSWER:** The allegations contained in Paragraph 104 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 104 and on that basis denies same.

105.    Despite these resources the subject aircraft's flight crew lacked training on how to mitigate or prevent an MCAS initiated crash from faulty AOA sensor data so that it could save the lives of the One Hundred and Fifty-Seven passengers and crew onboard.

**ANSWER:** ROSEMOUNT denies that any component designed, manufactured or sold by ROSEMOUNT was defective or otherwise sent faulty data due to any act or omission by ROSEMOUNT. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 105 and on that basis denies same.

106.    Boeing knew that information from a single AOA sensor could cause a fatal crash and knew that safer alternatives were available that were technologically available and economically feasible.

**ANSWER:** The allegations contained in Paragraph 106 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 106 and on that basis denies same.

107.    Yet Boeing did not design or redesign or retrofit the subject Max 8 aircraft to remove or reduce the occurrence of these hazardous events.

**ANSWER:** The allegations contained in Paragraph 107 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT

lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 107 and on that basis denies same.

108.    Rather than admit the truth about the Max 8, Boeing instead deliberately misrepresented the safety of its aircraft.

**ANSWER:** The allegations contained in Paragraph 108 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 108 and on that basis denies same.

109.    For instance, after the Lion Air Crash and months prior to the Ethiopian Airlines Crash, pilots from the Allied Pilot's Association complained to Boeing about its concealment of the MCAS system and the danger of hiding information on the Max 8 from pilots. In response Boeing misrepresented the safety of the Max 8.

**ANSWER:** The allegations contained in Paragraph 109 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 109 and on that basis denies same.

110.    During that meeting a pilot said "We flat out deserve to know what's on our airplane." "I don't disagree," the official from Boeing responded. "[The pilots of Lion Air 610] didn't even know the damn system was on the airplane," another pilot said. "Nor did anybody else." The Boeing official stated "I don't know that understanding this system would have changed the outcome of this, in a million miles you're going to maybe fly this airplane, and maybe once you're going to see this ever." Four months later, Ethiopian Airlines flight 302 crashed minutes after take-off and evidence continues to mount that the MCAS was a major factor in the crashes of the two planes.

**ANSWER:** The allegations contained in Paragraph 110 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 110 and on that basis denies same.

111.     Due to the danger posed by the Max 8 the Federal Aviation Administration has grounded the aircraft.

**ANSWER:** ROSEMOUNT admits only that following the accident, the Federal Aviation Administration grounded the Boeing 737 Max 8. ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 111 and on that basis denies same.

112.     As described in further detail herein, Boeing knew of the defects in the subject aircraft, knew that because of such defects the Max 8 was not airworthy, was on notice that the defects were likely to cause injury and death yet failed to adequately warn or instruct on the aircraft defects, failed to remedy the known defect in the subject aircraft, failed to discover the dangerous conditions when such could have been discovered and / or failed to take affirmative action to avoid injury to Plaintiffs and others.

**ANSWER:** The allegations contained in Paragraph 112 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 112 and on that basis denies same.

113.     Because of Boeing's gross, willful, and reckless disregard for human life, families, including the Mukua family, have mourned the loss of a loved one whose life should never have been put at risk. Families of the decedents were given soil from the crash site as they could not bury their loved ones because the bodies were burnt beyond recognition. Punitive damages should be awarded in this case to punish and deter Boeing and others from taking these kinds of risks with people's lives again.

**ANSWER:** The allegations contained in Paragraph 113 are directed at another entity and require no response from ROSEMOUNT. To the extent a response is required, ROSEMOUNT lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 113 and on that basis denies same.

## COUNT I
## Strict Liability: Design Defect, The Boeing Company

None of the allegations of Count I (Strict Liability: Design Defect, The Boeing Company), including Paragraphs 114 – 124 and all subparagraphs thereto, are directed to ROSEMOUNT. As

such, no response to Count I, Paragraphs 114 – 124 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such allegations and specifically denies that any component designed, manufactured, or sold by ROSEMOUNT was defective, prone to failure, or otherwise transmitted inaccurate, invalid, and/or implausible data due to any act or omission by ROSEMOUNT.

### COUNT II
### Strict Liability: Defect in Warnings / Instructions, The Boeing Company

None of the allegations of Count II (Strict Liability: Defect in Warnings / Instruction, The Boeing Company), including Paragraphs 125 – 138 and all subparagraphs thereto, are directed to ROSEMOUNT. As such, no response to Count II, Paragraphs 125 – 138 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such allegations and specifically denies that any component designed, manufactured, or sold by ROSEMOUNT was defective, prone to failure, or otherwise transmitted inaccurate, invalid, and/or implausible data due to any act or omission by ROSEMOUNT.

### COUNT III
### Breach of Warranty, The Boeing Company

None of the allegations of Count III (Breach of Warranty, The Boeing Company), including Paragraphs 139 – 151 and all subparagraphs thereto, are directed to ROSEMOUNT. As such, no response to Count 3, Paragraphs 139 – 151 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such

allegations and specifically denies that any component designed, manufactured, or sold by ROSEMOUNT was defective, prone to failure, or otherwise transmitted inaccurate, invalid, and/or implausible data due to any act or omission by ROSEMOUNT.

## COUNT IV
## Negligence, The Boeing Company

None of the allegations of Count IV (Negligence, The Boeing Company) including Paragraphs 152 – 163 and all subparagraphs thereto, are directed to ROSEMOUNT. As such, no response to Count IV, Paragraphs 152 – 163 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such allegations and specifically denies that any component designed, manufactured, or sold by ROSEMOUNT was defective, prone to failure, or otherwise transmitted inaccurate, invalid, and/or implausible data due to any act or omission by ROSEMOUNT.

## COUNT V
## Civil Conspiracy, The Boeing Company

None of the allegations of Count V (Civil Conspiracy, The Boeing Company) including Paragraphs 164 – 173 and all subparagraphs thereto, are directed to ROSEMOUNT. As such, no response to Count V, Paragraphs 164 – 173 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such allegations and specifically denies that any component designed, manufactured, or sold by ROSEMOUNT was defective, prone to failure, or otherwise transmitted inaccurate, invalid, and/or implausible data due to any act or omission by ROSEMOUNT.

## COUNT VI
## Negligence, Rosemount Aerospace

174.    Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

**ANSWER**: As and for its answer to Count VI, Paragraph 174, ROSEMOUNT repeats and realleges all of its answers to Paragraphs 1-173 as set forth above, as if set forth in full herein and incorporates same by reference.

175.    At all relevant times hereinabove set forth, Defendant Rosemount owed a duty to the occupants of Boeing's 737 Max 7 [sic] aircraft and the general public, including the Decedent, to exercise reasonable care to properly develop, design, engineer, test, manufacture, produce, process, supply, deliver, monitor, market, label, adequately warn, recommend, advertise and/or sell angle of attack sensors, and/or refrain from introducing area of attack sensors into the stream of commerce and for the use in 737 Max aircraft, including the subject aircraft.

**ANSWER:** The allegations of Paragraph 175 consist of conclusions of law to which no response is required from ROSEMOUNT. To the extent a response is required, ROSEMOUNT admits only those duties, if any, imposed by any law determined to be applicable to the determination of these actions. ROSEMOUNT denies the remaining allegations of Paragraph 175.

176.    The defective conditions in the Angle of Attack sensor, as discussed above, and the consequent crash of Flight 302 were legally caused by the negligence, gross negligence, wrongdoing, tortious conduct, careless acts and omissions of Defendant Rosemount in the development, design, engineering, testing, manufacturing, production, processing, supplying, delivery, monitoring, marketing, labeling, and selling, and Rosemount's failure to warn and failure to take remedial [sic] appropriate remedial action with respect to any and all known dangerously defective conditions.

**ANSWER:** ROSEMOUNT denies the allegations of Paragraph 176.

177.    As a direct and legal result of Defendant Rosemount's negligence, carelessness, gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set forth, Decedent died in the crash of Flight 302.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 177.

178.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Decedent suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by the death of Decedent.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 178.

179.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Rosemount, hereinabove alleged, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 179.

180.     As a further direct and legal result of the wrongful conduct of Rosemount set forth above, Plaintiffs incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 180.

181.     As a further direct and legal result of the wrongful conduct of Rosemount set forth above, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 181.

WHEREFORE, Defendant ROSEMOUNT AEROSPACE, INC. prays that Plaintiffs take nothing by way of their Complaint against ROSEMOUNT and that all claims, allegations, and causes of action against ROSEMOUNT be denied and dismissed with prejudice. ROSEMOUNT requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action, and any further relief the Court deems just and equitable.

## COUNT VII
## Strict Liability, Rosemount Aerospace

182.     Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

**ANSWER**: As and for its answer to Count VII, Paragraph 182, ROSEMOUNT repeats and realleges all of its answers to Paragraphs 1-181 as set forth above, as if set forth in full herein and incorporates same by reference.

183. At all relevant times hereinabove set forth, Defendant Rosemount was the designer, manufacturer, engineer, distributor and/or seller of aerospace products, including Angle of Attack sensors, who hold and have held themselves out to the public as having superior knowledge, skill and expertise in the design, testing, engineering, manufacture, and distribution of aerospace sensors for commercial aircraft and, in the course of its business, Defendant Rosemount designed, tested, manufactured, engineered and caused to be placed into the stream of commerce, a product known as an Angle of Attack sensor for utilization in the Boeing 737 Max 8 aircraft.

**ANSWER:** ROSEMOUNT admits only that it offers a wide range of products for pneumatic measurements of air data parameters, including, *inter alia*, angle of attack sensors designed, tested, and manufactured in accordance with Boeing's requirements for use in various aircraft, including the Boeing 737-8 MAX. ROSEMOUNT denies the remaining allegations of Paragraph 183.

184. Defendant Rosemount expressly or impliedly warranted that the Angle of Attack sensor was fit for its intended use in commercial aircraft, being free of defects in their design and/or maintenance and, further, Defendant Rosemount marketed, sold, distributed, and caused to be introduced into the stream of commerce by sale to Defendant Boeing. The Angle of Attack sensor was in substantially similar condition to its original condition at delivery to Boeing.

**ANSWER**: ROSEMOUNT admits only that, upon information and belief, it manufactured the angle of attack sensors on the Subject Aircraft and sold them to BOEING. ROSEMOUNT denies that the angle of attack sensors were defective or otherwise failed to operate as intended due to any act or omission by ROSEMOUNT. The remaining allegations contained in Paragraph 184 state conclusions of law to which no response is required. To the extent a response is required, ROSEMOUNT denies all such allegations.

185. Defects in the Angle of Attack sensor were a legal cause of the subject air crash, and the defects made the subject aircraft unreasonably dangerous for travel.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 185.

186. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Decedent suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs have been damaged by the death of Decedent.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 186.

187.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Rosemount, hereinabove alleged, Plaintiffs suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 187.

188.     As a further direct and legal result of the wrongful conduct of Rosemount set forth above, Plaintiffs incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 188.

189.     As a further direct and legal result of the wrongful conduct of Rosemount set forth above, Plaintiffs suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

**ANSWER**: ROSEMOUNT denies the allegations of Paragraph 189.

WHEREFORE, Defendant ROSEMOUNT AEROSPACE, INC. prays that Plaintiffs take nothing by way of their Complaint against ROSEMOUNT and that all claims, allegations, and causes of action against ROSEMOUNT be denied and dismissed with prejudice. ROSEMOUNT requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action, and any further relief the Court deems just and equitable.

## COUNT VIII
## Negligence, Collins

None of the allegations of Count VIII (Negligence, Collins Aerospace) including Paragraphs 190 – 197 and all subparagraphs thereto, are directed to ROSEMOUNT. As such, no response to Count VIII, Paragraphs 190 – 197 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such allegations.

## COUNT IX
### Strict Liability, Collins

None of the allegations of Count IX (Strict Liability, Collins Aerospace) including Paragraphs 198 – 205 and all subparagraphs thereto, are directed to ROSEMOUNT. As such, no response to Count IX, Paragraphs 198 – 205 is required from ROSEMOUNT. To the extent that it is determined that any of those allegations are directed to ROSEMOUNT and/or that responses to those allegations are otherwise required from ROSEMOUNT, ROSEMOUNT denies all such allegations.

### GENERAL DENIAL

ROSEMOUNT denies all allegations of Plaintiffs' Complaint that are not specifically admitted hereinabove, including but not limited to Plaintiffs' demands and prayers for relief. To the extent that the headings, captions, diagrams, charts, footnotes, or other insertions set forth in Plaintiffs' Complaint are determined to contain any allegation against ROSEMOUNT, all such allegations are denied.

### AFFIRMATIVE AND ADDITIONAL DEFENSES

In further response to the Plaintiffs' Complaint, ROSEMOUNT raises, asserts, and preserves the following affirmative and additional defenses:

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs fail, in whole or in part, to state a cause of action upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs and the alleged beneficiaries of the decedent's estate may lack capacity and/or standing to bring this action.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' Complaint should be dismissed or transferred under the doctrine of *forum non conveniens*.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint may be barred, in whole or in part, by the applicable statute of limitations.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint may be barred, in whole or in part, by the applicable statute of repose, including, but not limited to, by the General Aviation Revitalization Act Statute of Repose and the Illinois Statute of Repose.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims may be barred, in whole or in part, and/or preempted by federal law, including, but not limited to, the Federal Aviation Administration Authorization Act, and the aircraft components at issue were certified as safe and airworthy by the Federal Aviation Administration at the time they were delivered.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' action may be governed, in whole or in part, by the laws of jurisdictions other than Illinois.

## EIGHTH AFFIRMATIVE DEFENSE

ROSEMOUNT denies that its conduct was a cause or proximate cause of the Plaintiffs' alleged injuries and damages. Further, Plaintiffs' alleged damages, if any, were caused, in whole or in part, by the acts and/or omissions, including, but not limited to, unusual negligent acts or willful acts and/or omissions, or the alteration or misuse of any product(s) supplied by

ROSEMOUNT, by other persons or entities, named or unnamed, over whom ROSEMOUNT had no control or right to control, including, but not limited to, the pilots and operators of the accident aircraft, and those acts and/or omissions were the sole proximate cause or an intervening or superseding cause of any injuries or damages sustained by Plaintiffs. At this point, ROSEMOUNT has not had the benefit of discovery and does not specifically know the identity of any such third parties and will amend this defense to identify same when discovered.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, were caused by the acts or omissions of other persons or entities for which ROSEMOUNT is not liable or responsible. In the event ROSEMOUNT is found liable to Plaintiffs, which is expressly denied, ROSEMOUNT may be entitled to indemnification, contribution or apportionment of liability and fault pursuant to applicable law and reserves its right to seek same.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, may have been directly and proximately caused by an unavoidable accident for which ROSEMOUNT is not liable.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint should be dismissed on the ground that Plaintiffs have failed to join necessary and indispensable parties.

## TWELFTH AFFIRMATIVE DEFENSE

Based upon the state of scientific, industrial, technological, and military knowledge existing at the time, the design of any and all ROSEMOUNT products were reasonably safe for the subject aircraft's normal and foreseeable use and operation at all relevant times, or in light of existing and reasonably available scientific, industrial, and technological knowledge.

Accordingly, Plaintiffs' claims are barred, in whole or in part, because ROSEMOUNT's product design was consistent with or exceeded the generally recognized and accepted technological, scientific, industrial, and military state-of-the-art at the time of its design, testing, manufacture, and sale.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, may be barred and/or limited under applicable law.

## FOURTEENTH AFFIRMATIVE DEFENSE

The benefits and/or utility of the design of the subject aircraft and any component thereof provided by ROSEMOUNT outweigh the risks associated therewith, if any.

## FIFTEENTH AFFIRMATIVE DEFENSE

The products allegedly sold by ROSEMOUNT were intended for and sold to a knowledgeable and/or sophisticated user fully informed with respect to the risks and benefits of the use, operation, and/or capabilities of the subject aircraft at issue in this action and over whom ROSEMOUNT had no control. As such, Plaintiffs' claims are barred, in whole or in part, to the extent that adequate warnings were provided to the pilots, the operator of the aircraft, and/or other intermediaries or third parties regarding the risks and dangers associated with the operation and/or use of the subject aircraft and any ROSEMOUNT component product. Any duty on the part of ROSEMOUNT to warn Plaintiffs' decedent of the risks and dangers associated with such operation and/or use of the subject aircraft and any ROSEMOUNT component product, if any such duty exists, was satisfied through the information and warnings available to Plaintiffs' decedent or other intermediaries or third parties.

## SIXTEENTH AFFIRMATIVE DEFENSE

If Plaintiffs were damaged by product(s) originally designed, prepared, tested, and/or sold by ROSEMOUNT, which ROSEMOUNT expressly denies, those products were subsequently installed, removed, exchanged, altered, modified, repaired, retrofitted, damaged, overhauled, remanufactured, improperly maintained, or misused by persons and/or entities other than ROSEMOUNT, and over whom ROSEMOUNT had no control or right of control, and such installation, removal, exchange, alteration, modification, repair, retrofit, damage, overhaul, remanufacturing, improper maintenance, or misuse proximately caused and contributed to this accident and the resulting damages complained of, if any.

## SEVENTEENTH AFFIRMATIVE DEFENSE

ROSEMOUNT should be dismissed for lack of personal jurisdiction in the State of Illinois.

## EIGHTEENTH AFFIRMATIVE DEFENSE

ROSEMOUNT complied with all applicable federal, state and foreign statutes, codes, standards, and regulations, including, but not limited to, those of the United States and agencies thereof, existing at the time the subject aircraft and all component parts thereof were manufactured including all standards for design, inspection, testing and warning.

## NINETEENTH AFFIRMATIVE DEFENSE

While denying any and all allegations of negligence, wrongdoing, fault, or liability, ROSEMOUNT states that it would be entitled, at its sole election, to a full credit, offset, *pro-rata* reduction, or percentage reduction, based on the percentage of fault attributable to each settling defendant or non-party, in the event Plaintiffs settle with any defendant or non-party.

## TWENTIETH AFFIRMATIVE DEFENSE

Some or all of Plaintiffs' claims may be barred in whole or in part because Plaintiffs may have already received full satisfaction and/or compensation for the injuries and damages, if any, and the claims may be barred by Plaintiffs' prior release of claims and/or accord and satisfaction with any entity. While denying that Plaintiffs are entitled to any relief whatsoever, if ROSEMOUNT is required to pay a monetary award to Plaintiffs, ROSEMOUNT claims a set-off against any monies received by Plaintiffs for their alleged injuries or damages, including, but not limited to, any insurance proceeds.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

An award or judgment rendered in favor of Plaintiffs must be reduced by the amount of benefits Plaintiffs received, or are entitled to receive, from any source as a result of the death of their decedent.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

ROSEMOUNT should be dismissed as the Northern District of Illinois is the improper venue for this action.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

To the extent that the laws of other jurisdictions apply, ROSEMOUNT invokes each and every constitutional and statutory defense available to it under the constitutions, statutes, civil or other law of each of the other forty-nine states, the District of Columbia, the territories and possessions of the United States, and/or applicable foreign law. These laws specifically include, but are not limited to, provisions relating to due process, access to the courts, statutes of limitations and repose, and limitations on compensatory, non-economic, and punitive damages.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

ROSEMOUNT hereby adopts and incorporates by reference any affirmative defense asserted by any other defendants to this action, to the extent such affirmative defense applies to ROSEMOUNT, as if fully set forth herein.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Evidence of subsequent remedial measures is not admissible to prove liability. *See* Federal Rule of Evidence 407.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred, in whole or in part, by the absence of privity between Plaintiffs and ROSEMOUNT and by lack of proper notice to ROSEMOUNT.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred, in whole or in part, because ROSEMOUNT did not make any warranties to Plaintiffs with respect to the subject AOA sensors.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred, in whole or in part, because Plaintiffs are not third-party beneficiaries of any warranties that ROSEMOUNT may have made.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs' right to recovery, if any, is limited to or precluded by the warranty provisions, including limitations and disclaimer provisions, in Boeing's contract of sale for the subject Aircraft and/or documents relating thereto, as well as the warranty provisions, including limitation and disclaimer provisions, in ROSEMOUNT's contract of sale for the subject AOA sensors and/or documents relating thereto.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred because Plaintiffs did not rely upon any warranty from ROSEMOUNT.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' breach of warranty claim is barred because the subject AOA sensors were not used in a reasonable manner appropriate to the purpose for which they were intended, and any damages allegedly sustained by Plaintiffs were solely and proximately caused by such improper use of the product.

## RESERVATION OF FURTHER DEFENSES

ROSEMOUNT reserves the right to amend its Answer and to assert any and all additional defenses as may be revealed by further investigation, discovery, and determination of the substantive law that will govern this case.

## APPLICABILITY OF FOREIGN LAW

ROSEMOUNT hereby gives notice, pursuant to the provisions of Federal Rule of Civil Procedure 44.1, that it may raise issues concerning the applicability of the law(s) of a foreign country or countries to the claims and defenses raised in this matter and expressly reserves the right to assert such claims and defenses that may be available to it under the application of the substantive laws of such foreign jurisdiction.

WHEREFORE, Defendant ROSEMOUNT AEROSPACE, INC. prays that Plaintiffs take nothing by way of their Complaint against ROSEMOUNT and that all claims, allegations, and causes of action against ROSEMOUNT be denied and dismissed with prejudice. ROSEMOUNT requests this relief together with its costs and disbursements in this action, reasonable attorneys' fees associated with this action and any further relief the Court deems just and equitable.

## **JURY DEMAND**

ROSEMOUNT demands a trial by jury as to all claims and defenses in this action.

Dated: December 18, 2019                    ROSEMOUNT AEROSPACE, INC.


                                            By: /s/ Nicholas C. Bart
                                                *One of its Attorneys*

Nicholas C. Bart
Nick.Bart@fitzhunt.com
Shane B. Nichols
Shane.Nichols@fitzhunt.com
**Fitzpatrick & Hunt, Pagano, Aubert, LLP**
20 S. Clark Street, Suite 2620
Chicago, IL 60603
Phone: (312) 728-4901
Fax: (312) 728-4950

Garrett Fitzpatrick
Garrett.Fitzpatrick@fitzhunt.com
**Fitzpatrick & Hunt, Pagano, Aubert, LLP**
Tower 49
Twelve East 49th Street
31st Floor
New York, NY 10017
(212) 937-4000

## CERTIFICATE OF SERVICE

I, Shane B. Nichols, certify that on December 18, 2019 I electronically filed the foregoing

***DEFENDANT ROSEMOUNT AEROSPACE, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT AT LAW*** with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing to attorneys of record.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 18th day of December 2019.

By: /s/ Shane B. Nichols
**Fitzpatrick & Hunt, Pagano, Aubert, LLP**
20 S. Clark Street
Suite 2620
Chicago, IL 60603
Phone: (312) 728-4902
Fax: (312) 728-4950